Rockingham
No. 2005-251

RICHARD K. BENDETSON & a.

v.

KILLARNEY, INC. & a.

Argued: July 20, 2006
Opinion Issued: December 28, 2006

*Devine, Millimet & Branch, P.A.*, of Manchester (*Daniel E. Will* on the brief) and *Seegel Lipshutz & Wilchins, P.C.*, of Wellesley, Massachusetts (*Jeffrey P. Allen* and *Eric B. Goldberg* on the brief, and *Mr. Allen* orally), for the petitioners.

*Wiggin & Nourie, P.A.*, of Manchester (*Doreen F. Connor* on the brief) and *DiMento & Sullivan*, of Boston, Massachusetts (*Francis J. DiMento* and *Jason A. Kosow* on the brief, and *Mr. DiMento* orally), for the respondents.

BRODERICK, C.J. This case involves the breakdown of a business relationship between petitioner Richard K. Bendetson (Bendetson) and respondent Robert E. Buonato, Jr. (Buonato), and the resulting judicial dissolution of Killarney, Inc. (Killarney), a closely held New Hampshire

corporation the two established to engage in the business of real estate development and management. The petitioners are Bendetson, individually and as treasurer of Killarney; Eric Slifka and Robert R. Bendetson, as trustees of the Richard K. Bendetson Dynasty Trust; and Robert Curcio. The respondents include Killarney; Buonato, individually and as president of Killarney; New Killarney Limited Partnership (New Killarney); and Wellesley Companies, Inc. (Wellesley). The respondents appeal a decision of the Superior Court (*Morrill,* J.) setting aside Buonato's election to purchase Bendetson's shares of Killarney, *see* RSA 293-A:14.34 (1999), and its subsequent order dissolving Killarney, *see* RSA 293-A:14.30 (1999). We affirm.

I

The essential facts are drawn from various court orders or are otherwise evident in the record. Bendetson and Buonato have known each other since the mid-1970s when Buonato was about eleven years old. In 1974, Buonato's father and Bendetson began engaging in business dealings together and developed a personal friendship. In the late 1980s, when Buonato was about twenty-five years old, he went to work for Bendetson. Later, Buonato and Bendetson dealt in real estate ventures together. In 1994, they formed Killarney as equal shareholders and served as the company's sole officers and directors. Buonato was president and secretary, and Bendetson was treasurer. Contemporaneously, they formed New Killarney, a New Hampshire limited partnership, and designated Killarney as its sole, controlling general partner with a one percent interest. Buonato and Bendetson each effectively controlled 49.5 percent of the partnership. New Killarney purchased a residential apartment complex in Northfield. By agreement, Buonato used Wellesley, his own management company, to manage the apartment complex. At some point, the relationship between Buonato and Bendetson soured. They last met as Killarney shareholders on July 30, 2001, but were unable to elect successors to the board of directors. Indeed, at that special shareholders' meeting, Bendetson moved for a vote to elect directors, and Buonato, the only other shareholder, would not second the motion. Since then, they have been unable to schedule or hold another shareholders' meeting.

In November 2001, the petitioners filed a petition in the superior court seeking, among other relief, the judicial dissolution of Killarney and New Killarney. Concerning Killarney, they alleged that the directors were deadlocked in the management of corporate affairs and that the shareholders were unable to break the deadlock. *See* RSA 293-A:14.30(b). They also claimed that irreparable injury was threatened or being suffered, and that the business affairs of the corporation no longer could

be conducted to the advantage of the shareholders generally or in furtherance of Killarney's purpose as the general partner of New Killarney. *See id.* Regarding New Killarney, the petitioners alleged that it was not reasonably practicable to carry on its business in conformity with the limited partnership agreement given the director and shareholder deadlock at Killarney, the sole general partner of New Killarney. *See* RSA 304-B:45 (2005). In January 2002, Buonato filed an election to purchase, at fair value, all shares in Killarney owned by Bendetson. *See* RSA 293-A:14.34(a). Thereafter, the parties attempted, without success, to negotiate a price for the sale of Bendetson's shares.

The petitioners subsequently filed a motion to appoint a custodian and remove Buonato as president of Killarney; for their part, the respondents filed a motion to stay the judicial dissolution proceeding so the trial court could determine the fair value of Bendetson's shares in Killarney. The Superior Court (*Hollman*, J.) denied the petitioners' motion, finding that "contrary to [their] allegations, Buonato has properly and productively managed the business and affairs of Killarney." The trial court also granted the respondents' motion to stay the judicial dissolution proceeding "so that a determination may be made as to the fair value of Bendetson's shares in Killarney which respondents are electing to buy." The Superior Court (*Coffey*, J.) thereafter scheduled a structuring conference and the valuation proceeding.

In February 2004, the parties attended the valuation proceeding, and the hearing began with a colloquy between the court and counsel concerning the history and status of the dispute. The court noted that dissolution of the limited partnership, New Killarney, was pending and that Buonato's full ownership of Killarney through election would effectively grant him complete control over New Killarney as well. Over the respondents' objection, the court set aside Buonato's election to purchase Bendetson's shares in Killarney and scheduled a hearing on the dissolution of New Killarney and Killarney. In February 2005, the trial court conducted an evidentiary hearing, at the conclusion of which the petitioners withdrew their request for the dissolution of New Killarney. The trial court subsequently ordered the dissolution of Killarney. This appeal followed.

The respondents make three arguments. First, they argue that the trial court erroneously interpreted RSA 293-A:14.34(a) as permitting it to exercise discretion to set aside Buonato's election to purchase Bendetson's shares in Killarney when Buonato, the electing shareholder, did not seek to revoke his right to elect. Second, they contend that even if the court had the discretion to set aside Buonato's election, it unsustainably exercised that discretion. Third, they argue that the trial court erred when it

concluded that the evidence established sufficient grounds for judicial dissolution of Killarney. We address each argument in turn.

## II

The respondents first argue that the trial court lacked the authority under RSA 293-A:14.34(a) to set aside Buonato's election to purchase Bendetson's shares in Killarney. They contend that shareholders are entitled to elect to purchase a petitioning shareholder's shares and thus avoid the dissolution of the corporation, and that the election statute forbids revocation of the election by the elector without permission of the court. According to the respondents, the trial court's authority to exercise its equitable power to set aside a timely filed election to purchase is triggered only when the electing shareholder seeks to rescind the otherwise irrevocable election, and there is no authority under the statute for the trial court to exercise its discretionary authority until the electing shareholder seeks permission to set the election aside. The petitioners contend, however, that the election statute empowers the trial court to set aside a stock purchase election whenever it is equitable to do so, and that the trial court's exercise of equitable authority is not triggered solely by an electing party's request to revoke an election.

This court is the final arbiter of the legislature's intent regarding the meaning of a statute considered as a whole, and our review of the trial court's statutory interpretation is *de novo*. *In the Matter of Giacomini & Giacomini*, 151 N.H. 775, 776 (2005). We first examine the language of the statute, and where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Id.* at 776-77. Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *In the Matter of Donovan & Donovan*, 152 N.H. 55, 58 (2005).

Once a shareholder seeks judicial dissolution of a corporation under RSA 293-A:14.30(b), the corporation or other shareholders may elect to purchase all of the shares of the petitioning shareholder. Specifically:

In a proceeding under RSA 293-A:14.30(b) to dissolve a corporation that has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association, the corporation may elect or, if it fails to elect one or more shareholders may elect to purchase all shares owned by the

petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable, unless the court determines that it is equitable to set aside or modify the election.

RSA 293-A:14.34(a). An election may be filed at any time within ninety days after the filing of the judicial dissolution petition "or at such later time as the court in its discretion may allow." RSA 293-A:14.34(b) (1999). Therefore, if an election is filed beyond the ninety-day time period, the court may exercise discretion and determine whether to allow the delayed election. Otherwise, a timely filed election is subject only to the specific provision in dispute here: "An election pursuant to this section shall be irrevocable, unless the court determines that it is equitable to set aside or modify the election." RSA 293-A:14.34(a) (election irrevocability provision).

An election, however, does not effect an automatic stay upon the judicial dissolution proceeding. Rather,

[a]fter an election has been filed by the corporation or one or more shareholders the proceeding under RSA 293-A:14.30(b) shall not be discontinued or settled, nor may the petitioning shareholder sell or otherwise dispose of his shares, unless the court determines that it would be equitable to the corporation and the shareholders other than the petitioner to permit such discontinuance, settlement, sale, or other disposition.

RSA 293-A:14.34(b). The parties have sixty days to "reach [an] agreement as to the fair value and terms of purchase of the petitioner's shares." RSA 293-A:14.34(c) (1999). If they fail to do so, either party may petition the court to stay the dissolution proceedings and determine the fair value of the petitioner's shares. RSA 293-A:14.34(d) (1999).

The respondents contend that election is a matter of right when filed within ninety days of the filing of the judicial dissolution petition. Within the election irrevocability provision, the respondents target the term "irrevocable," which is not defined by the statute, and argue that the common meaning of "revoke" connotes that the party asserting a particular action is attempting to recall, withdraw or reverse it. Thus, according to the respondents, an election remains irrevocable by the electing party, and only if that party seeks to recall it may the trial court exercise its equitable power to set aside the election. They contend that the irrevocable nature of an election does not permit the trial court to exercise equitable power to set an election aside either *sua sponte* or at the request of the party who petitioned for judicial dissolution. We do not agree with the respondents' narrow reading of the statute.

The election irrevocability provision contains two clauses. The first clause mandates that election is irrevocable: "An election pursuant to this section shall be irrevocable." RSA 293-A:14.34(a). The second clause qualifies the first such that election remains irrevocable "unless the court determines that it is equitable to set aside or modify the election." *Id.* The second clause essentially creates an exception to an otherwise "irrevocable" election, and the meaning of the term "irrevocable" guides the applicability of that exception.

"Irrevocable" means "incapable of being recalled or revoked : past recall : UNALTERABLE," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1196 (unabridged ed. 2002); and also "committed beyond recall," BLACK'S LAW DICTIONARY 848 (eighth ed. 2004). "Revoke" means "to bring or call back," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* at 1944, and "recall" means "to call back . . . or cause to return," *id.* at 1893. We agree with the respondents to the extent that the term "irrevocable" commonly describes the relationship between an actor and an action initiated by that actor. Thus, generally speaking, if an action is irrevocable, the actor who initiated the action may not withdraw it, alter it, or otherwise call it back. While the dictionary definition provides us with guidance, we also consider the meaning of the term within the context of the dissolution and election provisions, as well as the policy underlying them. *See Donovan*, 152 N.H. at 58; *see also Nashua School Dist. v. State*, 140 N.H. 457, 458 (1995).

Our election statute is nearly identical to the like provision in the Model Business Corporation Act, *see* MODEL BUS. CORP. ACT ANNOTATED § 14.34 (3d ed. 2005), and thus, we look to the official comments of the model act for guidance on the intended meaning of the election statute, *cf. State v. Donohue*, 150 N.H. 180, 183 (2003) (reviewing official comments of Model Penal Code for guidance to interpret analogous New Hampshire statute). One comment states, in pertinent part:

> The election to purchase is wholly voluntary, but it can be made as a matter of right within 90 days after the filing of the petition under section 14.30(2). After 90 days, leave of court is required. Once an election is filed:
>
> (i) the election is irrevocable and may not be set aside or modified (as to one or more parties) unless the court determines it is equitable to do so; and
>
> (ii) the dissolution proceeding under section 14.30(2) may not be discontinued or settled and the petitioning

shareholder may not dispose of his shares without court approval.

MODEL BUS. CORP. ACT ANNOTATED § 14.34 cmt. 2, at 14-148. The comment explains that by restricting the parties' ability to thwart either the dissolution process or an election to purchase, the dissolution and election provisions were designed "to reduce the risk that either the dissolution proceeding or the buyout election will be used for strategic purposes." *Id.* Election is described as a "matter of right," such that a petitioning shareholder's "shares are, in effect, subject to a 'call' for 90 days after commencement of the [judicial dissolution] proceeding." *Id.* Thus, once an election is filed, the petitioning shareholder "becomes irrevocably committed to sell his shares," *id.*, and may not discontinue the dissolution proceeding, or otherwise dispose of the shares, without the court's permission, *id.* Conversely, while election does not automatically stay the dissolution proceedings, RSA 293-A:14.34(b), the electing party becomes irrevocably committed to buying the petitioner's shares absent court permission to revoke the election, MODEL BUS. CORP. ACT ANNOTATED § 14.34 cmt. 2, at 14-148; RSA 293-A:14.34(b). Accordingly, the election irrevocability provision, specifically the term "irrevocable," was intended to bind both the petitioning shareholder to sell his shares and the electing party to buy them, and it does not refer exclusively to the electing party's ability to opt out of his election. No language within the election irrevocability provision conditions the trial court's exercise of its equitable power to set aside the election upon one party's request to revoke an election, and we will not read language into the statute that it does not contain. *See Giacomini,* 151 N.H. at 777.

We acknowledge that the official comment refers to election as a "matter of right" when filed within ninety days of the dissolution petition. This right is not unqualified, however. The comment also states that "[o]nce an election is filed, it may be set aside or modified . . . for reasons that the court finds equitable." MODEL BUS. CORP. ACT ANNOTATED § 14.34 cmt. 2, at 14-149. Even though the comment does not speak explicitly to the question of whether a trial court's exercise of equitable authority is contingent upon the electing party's motion to revoke the election, it does underscore the intended design of the dissolution and election provisions to reduce strategic maneuvers between the parties. *See* RSA 293-A:14.34(b). Interpreting the election irrevocability provision in a manner that would effectively bar the trial court from addressing the equities of a particular case absent a request to revoke initiated by the electing party would contravene this intended design of the provision.

We acknowledge that generally speaking, because of dissolution's "adverse effects on shareholders, employees, and others who may have an interest in the continuation of the business," election is often favored over judicial dissolution as a remedy. MODEL BUS. CORP. ACT ANNOTATED § 14.34, at 14-147. This policy is supported in part by the presumption that "the rights of the petitioning shareholder are fully protected by liquidating only his interest and paying the fair value of his shares while permitting the remaining shareholders to continue the business." *Id.* In the event that election would provide an unfair advantage to the electing party, however, the electing party is not likely to seek to withdraw the election, and the legislature did not intend to constrain the trial court from addressing the equities in such a case.

Our reading of the irrevocability provision comports with RSA 293-A:14.34(b), which precludes an automatic stay of the underlying dissolution proceedings while protecting an electing party's ability to purchase the shares of the petitioning party. This provision bars the petitioning shareholder from disposing of his shares "unless the court determines that it would be equitable to the corporation and the shareholders other than the petitioner to permit such discontinuance, settlement, sale, or other disposition." RSA 293-A:14.34(b). Again, the legislature expressly incorporated the trial court's authority to consider the equities at play in a particular case. Explicit reference to the court's equitable powers in both RSA 293-A:14.34(a) and (b) indicates that the legislature intended to empower the court to enforce principles of fair play in a situation that is often rife with tension and ill-will.

Further, subsection (b) directs the trial court to consider the perspectives of certain parties, "the corporation and the shareholders other than the petitioner," while the election irrevocability provision does not contain a similar restriction. *Compare* RSA 293-A:14.34(b) *with* RSA 293-A:14.34(a). This suggests that the legislature intended for the trial court to review the equities from *all* parties' perspectives when a party elects to purchase the petitioning shareholder's stock. This comprehensive frame of reference is consistent with the trial court's authority to address the equities of election in a particular case without the contingency of one particular party, the electing shareholder, invoking the trial court's discretion.

The respondents rely upon a provision in the judicial dissolution statute to assert that shareholders are entitled to avoid dissolution by election. Specifically, RSA 293-A:14.31(d) (1999) (notice provision), provides:

> Within 10 days of the commencement of a proceeding under
> RSA 293-A:14.30(b), to dissolve a corporation that has no shares

listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national securities exchange, the corporation shall send to all shareholders, other than the petitioner, a notice stating that *the shareholders are entitled to avoid the dissolution of the corporation by electing to purchase the petitioner's shares under RSA 293-A:14.34* and accompanied by a copy of RSA 293-A:14.34.

(Emphasis added.) The respondents assert that the "entitled to avoid" phrase demonstrates that electing parties have a right to purchase the petitioning shareholder's stock and that such election when timely made is irrevocable absent the electing party requesting the court to set aside the election. We disagree.

█ In some sense, an election to purchase may be considered a right or an entitlement because unlike a petition for judicial dissolution, the election provision contains no specific substantive elements or factors for an electing party to affirmatively prove in order to pursue an election. *Compare* RSA 293-A:14.30 *with* RSA 293-A:14.34(a). Nothing in the notice provision, however, grants the electing party an unassailable right to elect. Rather, it simply informs shareholders of whatever election rights exist under RSA 293-A:14.34(a), and we have concluded that the election provision renders the electing party's right to elect subject to the trial court's authority to set aside the election when equity so requires.

Finally, our interpretation is supported by foreign case law. In *Giulietti v. Giulietti*, 784 A.2d 905, 943 (Conn. App. Ct. 2001), the electing party argued that the trial court improperly refused to stay the judicial dissolution proceedings so as to allow him to pursue his election to purchase the shares of the petitioning party. Interpreting statutory election provisions nearly identical to those contained in our election statute, RSA 293-A:14.34(a) and (b), the appellate court concluded that "[t]he plain language of the statute . . . gives the court the discretion both to discontinue the corporate dissolution proceedings and to revoke a shareholder's election to purchase the shares of the petitioner when in the court's judgment it would be equitable to do so." *Giulietti*, 784 A.2d at 943. Notably, the *Giulietti* court used the term "revoke" to extend to the court's authority to revoke election, and did not limit the term to the electing party's attempt to recall the election. Because the *Giulietti* court interpreted the plain language of the statute as permitting the trial court to set aside election over the electing party's objection, it declined to adopt the electing party's reading of the statute and enforce election. *Id.* Though the *Giulietti* court's statutory analysis may be considered dicta, it is supportive of and consistent with our interpretation of RSA 293-A:14:34(a).

Should the legislature disagree with our construction of the election irrevocability provision, it is free to amend it. *Marceau v. Concord Heritage Life Ins. Co.*, 149 N.H. 216, 221 (2003).

## III

The respondents argue, in the alternative, that the trial court unsustainably exercised its discretion under RSA 293-A:14.34(a) when it set aside Buonato's election to purchase Bendetson's shares in Killarney. They contend that one presiding judge should not have overruled the decision of another presiding judge, that the trial court failed to hold an evidentiary hearing to support its decision, and that the trial court "turned the statutory procedure on its head [by] forcing the Respondents to first prove that the venture should not be dissolved before it would value the Petitioner's shares so that Respondents could exercise their irrevocable, matter-of-right election." The respondents also contend that no objective basis exists on the record to sustain the trial court's decision.

When we determine whether a ruling made by the trial court is a proper exercise of judicial discretion, we are really deciding whether the record establishes an objective basis sufficient to sustain the court's discretionary judgment. *State v. Lambert*, 147 N.H. 295, 296 (2001). The trial court has wide latitude in rendering decisions in equity according to the circumstances of a particular case, and we will uphold its decision unless it is unsupported by the evidence or erroneous as a matter of law. *See Nordic Inn Condo. Owners' Assoc. v. Ventullo*, 151 N.H. 571, 576-77 (2004) (reviewing decision on equitable doctrine of laches).

In 2002, the superior court granted the respondents' motion to stay the judicial dissolution proceeding and scheduled a merits hearing to determine the fair value of Bendetson's Killarney shares to carry out Buonato's election to purchase them. The petitioners requested an interlocutory appeal from the ruling and a stay of the scheduled valuation proceedings, which was denied. In 2004, the trial court, with a different presiding judge, commenced the valuation hearing and initiated a colloquy concerning the propriety of conducting a valuation hearing. Ultimately, the trial court declined to permit Buonato to elect to purchase Bendetson's shares, essentially reversing the decision of the earlier presiding judge. Because the superior court has the discretion to review its orders at any time prior to final judgment, *see Fastrack Crushing Servs. v. Abatement Int'l/Advatex Assocs.*, 149 N.H. 661, 664 (2003), we discern no legal error in the process of this case.

We also reject the respondents' challenge to the lack of an evidentiary hearing. The trial court engaged in a full colloquy with counsel

about the posture of the case. Counsel for both parties proffered undisputed facts concerning the ownership structure of Killarney and New Killarney. The dispute focused upon whether election would impart an unfair advantage to Buonato concerning the control of New Killarney. The respondents do not point to a statutory provision or to other legal authority requiring an evidentiary hearing in this context, do not direct us to any portion of the record in which they requested an evidentiary hearing and identify no additional facts that an evidentiary hearing would have uncovered.

■ In addition, the respondents' argument that the trial court somehow turned the statutory process "on its head" lacks merit. The trial court was following the process permitted by the statute by reviewing the equities of the case and ultimately deciding to set aside the election. Further, the trial court did not, as the respondents contend, require them "to first prove that the venture should not be dissolved before it would value [Bendetson's] shares." There appears to be one occasion during the 2004 hearing when the court misspoke about the burden of proof, making a passing comment to which no one objected. At the dissolution merits hearing in 2005, however, the record reveals that the petitioning parties bore the burden of proof.

■ Finally, we conclude that the respondents have failed to establish that no objective basis exists in the record to support the trial court's equitable decision to set aside the election. During the 2004 hearing, the court focused upon the ownership structure of Killarney and New Killarney, the impact the election ultimately might have on this structure, and the pending litigation involving dissolution of the limited partnership. Because Killarney was the sole general partner of the limited partnership, the court anticipated that Buonato's purchase of Bendetson's Killarney stock would give Buonato full ownership of Killarney, New Killarney's sole general partner, and thus place Buonato in full control of New Killarney. The trial court also was concerned that disrupting Bendetson's control in New Killarney potentially would interfere with his ability to seek dissolution of the limited partnership. The trial court expressed concern that the limited partnership agreement was in effect until 2044, and while Bendetson would retain his 49.5 percent ownership of New Killarney, he would "have no control." The respondents acknowledged the potential practical implications of election when counsel stated that "once we control the general partner, the case falls completely and there's not going to be a liquidation hearing [for the partnership] because they can't satisfy the terms of the partnership." The trial court ultimately determined that it would not be equitable to decide valuation of Bendetson's Killarney shares

and essentially give Buonato a "leg up" in the ongoing limited partnership. Accordingly, we conclude that the respondents have failed to establish that the trial court's equitable decision to set aside Buonato's stock purchase election is unsupported by the record.

IV

Finally, the respondents argue that the evidence does not establish sufficient grounds for judicial dissolution of Killarney. The petitioners sought judicial dissolution under RSA 293-A:14.30, and after conducting an evidentiary hearing, the trial court concluded that the evidence supported dissolution under both RSA 293-A:14.30(b)(i) and (ii). We will sustain a trial court's findings and conclusions unless they are lacking in evidentiary support or are tainted by error of law. *Appeal of State of N.H.*, 147 N.H. 426, 429 (2002). Because we conclude that the record supports the trial court's conclusion that Bendetson established all the necessary elements under subsection (b)(ii), we do not address the propriety of its conclusions under subsection (b)(i).

For the superior court to dissolve a corporation under RSA 293-A:14.30(b)(ii), the petitioning shareholder must establish that "[t]he shareholders are deadlocked in voting power and have failed, for a period that includes at least 2 consecutive annual meeting dates, to elect successors to directors whose terms have expired." RSA 293-A:14.30(b)(ii). The respondents challenge the trial court's finding that the term for the Killarney directors expired. They contend that the evidence failed to establish the manner in which Killarney directors are installed, other than the procedure described in the Incorporator Action by Unanimous Written Consent document signed by Buonato and Bendetson when they first incorporated Killarney. That document specifies that "[t]he number of directors of the Corporation, until changed in accordance with the By-Laws, is fixed at two (2) and that the following persons are hereby elected Directors to serve in accordance with the By-Laws as the initial directors," and it names Buonato and Bendetson. The respondents argue that because the evidence does not establish a director's "term of office [or] its expiration," the current directors' terms have never expired, and thus, the trial court's conclusion that the shareholders failed to elect successors to directors whose terms have expired is clearly erroneous. We conclude, however, that the respondents fail to demonstrate trial court error.

The Killarney by-laws require an annual meeting of shareholders to occur each March, and if an election of directors is not held at the annual meeting, the directors must cause the election to occur at a special meeting of the shareholders "as soon thereafter as convenient." As found by the

trial court, Buonato and Bendetson, Killarney's sole shareholders, were unable to elect successors to the Killarney directors at a special meeting of the Killarney shareholders on July 30, 2001. Indeed, the trial court found that this meeting was the last that occurred between the shareholders, about three and one-half years prior to the dissolution trial, and further found that "the parties are so hopelessly deadlocked that they have not been able to schedule or hold a shareholders' meeting since 2001." The trial court determined that under the by-laws, the current directors' one-year terms had expired, though Buonato and Bendetson continued to lawfully serve in a holdover capacity. Accordingly, the trial court concluded that all elements were established for judicial dissolution of Killarney under RSA 293-A:14.30(b)(ii).

Under the Killarney by-laws, Article First, Section 4,

[t]he term of office of a Director elected at the annual meeting of the Stockholders shall be one year, provided, however, that he shall hold his office until his successor shall be elected and qualified. A Director elected by the Stockholders or elected by the Directors shall hold office until the next annual meeting of Stockholders and the election and qualification of his successor.

By their plain language, the by-laws provide that each director serves a one-year term. If successors are not in place at the conclusion of that term, the by-laws permit the predecessor directors to remain serving in a holdover capacity. We agree with the trial court's reading of this by-law: "The fact that a director may continue to serve lawfully in a holdover capacity after his term has expired does not mean that the length of his term is infinite." Thus, the trial court committed no error when it concluded that the term of the Killarney directors expired with the passage of one year from their election, despite their holdover status.

The respondents rely upon *Levine v. Beem*, 608 So. 2d 373, 374-75 (Ala. 1992), to support their position. Although they provide no analysis of the case, they parenthetically aver that the *Levine* court "affirm[ed] [the] denial of dissolution under [an] MBCA provision identical to RSA 293-A:14.30(b)(ii)." We conclude, however, that the *Levine* case provides no guidance here. The *Levine* court rejected the petitioning shareholder's contention that the shareholders' deadlock had prevented an election of directors because evidence showed that the shareholders made no attempt to elect directors for fifteen to twenty years and that the petitioning shareholder refused to attend meetings. *Levine*, 608 So. 2d at 375. The court concluded that the evidence established "nothing more than a possibility of future shareholder deadlock preventing the election of directors," and thus "the extreme remedy of dissolution [was] not

warranted." *Id.* By contrast, the undisputed evidence in this case shows that Bendetson not only attended the July 30, 2001 special shareholder meeting but expressly moved for a vote to elect directors, and Buonato, the only other shareholder, would not second the motion. The differing facts of *Levine* make the decision in that case inapposite to the circumstances before us.

Finally, we decline to address the merits of the respondents' argument that the trial court erred in a particular conclusion of law determining that the failure to hold annual meetings is a basis for judicial dissolution. Even assuming this single conclusion of law constituted legal error, it is clear from the face of the trial court's order that it based its decision for judicial dissolution under RSA 293-A:14.30(b)(ii) upon the existence of all necessary legal elements provided in the statute. The respondents have failed to establish that the trial court erred in ordering the dissolution of Killarney under RSA 293-A:14.30(b)(ii).

*Affirmed.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.